UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

DAVID LETTIERI,

Defendant.

---

21-CR-20-LJV
DECISION & ORDER

## **BACKGROUND**

The defendant, David Lettieri, has been indicted for enticing a minor to engage in sexual activity for which someone could be charged with a crime (18 U.S.C. § 2422(b)). Docket Item 11. On June 7, 2021, Lettieri filed omnibus pretrial discovery motions; motions to suppress his statements and evidence seized during three searches; and a motion to dismiss the indictment. Docket Item 24. After the government responded on July 28, 2021, Docket Item 26, United States Magistrate Judge Michael J. Roemer heard oral argument and scheduled an evidentiary hearing on Lettieri's motions to suppress his statements. *See* Docket Item 28.

At Lettieri's request, the hearing was adjourned twice to January 4, 2022. *See* Docket Items 29-32 and unnumbered November 4, 2021 docket entry. On December 14, 2021, however, Lettieri's counsel asked for a competency examination, *see* Docket Item 33, and instead of conducting the suppression hearing on January 4, 2022, Judge Roemer granted the motion for a competency exam. Docket Items 35, 36. Two months later, based on the report of Rory P. Houghtalen, M.D., Docket Item 77, Judge Roemer

found Lettieri mentally competent, Docket Item 38. Lettieri then requested new counsel, and new counsel was assigned that same day. *Id*.

After the defense motions were supplemented, Docket Items 39-41, and the suppression hearing was twice rescheduled, Docket Items 42-47 and unnumbered August 18, 2022 docket entry, Lettieri again requested a new lawyer, *see* Docket Item 48. Judge Roemer discussed the matter with both sides and again assigned new counsel to Lettieri.[1] *Id*. Judge Roemer directed new counsel to file any additional motions by October 17, 2022, and the evidentiary hearing was rescheduled to November 14, 2022. Docket Item 49. Although Judge Roemer later extended Lettieri's time to file additional motions until October 31, 2022, none were filed. *See* Docket Items 50, 51.

The suppression hearing finally was held on November 14, 2022. Docket Items 55, 59. Federal Bureau of Investigation Special Agent Randall E. Garver testified for the government, and twelve exhibits, including the video-recorded interview of Lettieri, were admitted into evidence during the government's case. Docket Items 55, 59, and 128. Lettieri submitted an affidavit in support of his motions, Docket Item 24-1, and

---

[1] Lettieri has been represented by several attorneys during the two-and-one half years that his case has been pending. He originally was represented by an Assistant Federal Public Defender, *see* Docket Item 3, but then retained counsel, *see* Docket Items 5-7. A few months later, retained counsel moved to withdraw, *see* Docket Item 9, and the Assistant Federal Public Defender was reassigned, *see* Docket Item 10. A different attorney then filed a notice of appearance, *see* Docket Item 17, and when Lettieri became unhappy with him, two Assistant Federal Public Defenders, including the one who had represented him earlier, were assigned, *see* Docket Item 38. A third Assistant Federal Public Defender then appeared as well, *see* Docket Item 45, but Lettieri was not happy with those attorneys, *see* Docket Item 48, so his current counsel was assigned to represent him, *see* Docket Item 49.

attorney David Siegel testified on Lettieri's behalf as well. *See* Docket Item 59. Following the hearing, Judge Roemer ordered simultaneous briefing and scheduled oral argument. Docket Item 55; Docket Item 59 at 140-41.

Each side filed post-hearing memoranda of law on January 23, 2023, Docket Items 65, 66, and responded to the other on February 6, 2023, Docket Items 68, 69. Judge Roemer then heard further argument on February 14, 2023. Docket Item 72. On February 27, 2023, Judge Roemer issued his Report, Recommendation and Order ("RR&O"), finding that Lettieri's motions to dismiss the indictment, to suppress evidence, and to suppress his statements, Docket Item 24, all should be denied. Docket Item 78.

With respect to Lettieri's motion to suppress his statements, Judge Roemer found that Lettieri was given his *Miranda* warnings, knowingly and voluntarily waived his rights, and consented to speak with law enforcement. *Id*. at 12. Judge Roemer also found that a text message that Lettieri sent to Siegel, his friend who is an attorney, could not possibly have invoked Lettieri's right to counsel because law enforcement did not know about it. *Id*. at 12-13. And Judge Roemer concluded that Lettieri's request to speak to a friend who was a lawyer before he signed the written statement prepared by law enforcement was at most a limited invocation of his right to counsel and did not warrant suppression. *Id*. at 13-14.

Likewise, Judge Roemer found that Lettieri's rights were not violated by the searches performed pursuant to three warrants issued by two different judges: 1) a warrant to search Lettieri's Facebook account and an account for a Verizon Wireless telephone number, issued on October 26, 2020, by Judge Roemer[2]; 2) a warrant to

---

[2] 20-MJ-5264-01 and 20-MJ-5264-02.

search Lettieri's person, vehicle, and residence, issued on November 2, 2020, by Northern District of New York Magistrate Judge Therese Wiley Dancks, Docket Item 131; and 3) a warrant to search for information associated with a T-Mobile telephone number, issued on February 10, 2021, by Judge Roemer[3]. Docket Item 78 at 17. Judge Roemer found that all three warrants were supported by probable cause and that the warrant applications did not contain any material misstatements or omissions that might justify a *Franks* hearing. *Id*. at 19-22. And he found that even if the warrants were deficient for some reason, "the 'good faith exception' established in *United States v. Leon*, 468 U.S. 897 (1984)," would preclude suppression. *Id.* at 22.

Finally, Judge Roemer found that the indictment was sufficient because it put Lettieri on notice of the "core of criminality" of the charges*, id*. at 24, and that "any concerns of proper notice and possible prejudice [were] alleviated" by a bill of particulars, *id*. at 28-29 (citing Docket Item 41 at 8 ("supplemental bill of particulars") (capitalization omitted). He therefore recommended that this Court deny the motion to dismiss the indictment. *Id*. at 29.

After this Court twice extended Lettieri's time to object to the RR&O, Docket Items 79, 84, 87, Lettieri filed his objections on April 3, 2023, Docket Item 91. The government responded on April 17, 2023, Docket Item 97, and Lettieri replied on May 1, 2023, Docket Item 100. This Court heard oral argument on May 16, 2023. Docket Item 112.

---

[3] 21-MJ-5022.

## LEGAL PRINCIPLES

A district court may accept, reject, or modify the findings or recommendation of a magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3). The court must review *de novo* those portions of a magistrate judge's recommendation to which a party objects. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3).

This Court has carefully and thoroughly reviewed the RR&O, the objections, the response, the reply, and the materials submitted to Judge Roemer, including the transcript of the evidentiary hearing and the exhibits. Based on that *de novo* review and for the reasons that follow, this Court accepts and adopts the RR&O in its entirety, and Lettieri's motions to suppress and dismiss are denied.

## FACTS[4]

In the late summer or early fall of 2020, Child Exploitation Task Force Officer Michael Hockwater received information from the Wyoming County Sheriff's Office about inappropriate communications between Lettieri and a minor female. Docket Item 59 at 18-19; Docket Item 1 at 3-6. Hockwater shared that information with another

[4] The facts are taken from the transcript of the evidentiary hearing conducted by Judge Roemer on November 14, 2022, Docket Item 59, and the hearing exhibits, Docket Item 128. Based on Judge Roemer's credibility finding, Docket Item 78 at 9-10, this Court credits the testimony of the witnesses. *Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008) ("[A] district judge should normally not reject a proposed finding of a magistrate judge that rests on a credibility finding without having the witness testify before the judge") (quoting *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999)). Like Judge Roemer, this Court therefore "declines to credit the self-serving statements in defendant's affidavit that he invoked his Fifth and Sixth Amendment rights prior to questioning or that he was not advised of *Miranda* rights." Docket Item 78 at 9.

member of the task force, FBI Special Agent Randall Garver, Docket Item 59 at 18-19, and they decided to seek a warrant to search Lettieri's Facebook account. *Id*. at 19. On October 26, 2020, Judge Roemer issued the warrant they requested, 20-MJ-5264-01 at Docket Items 1, 2,[5] and after they reviewed the Facebook account, Garver and Hockwater applied for warrants to arrest Lettieri and to search his residence. Docket Item 1; Docket Item 59 at 19-20; Docket Item 128 at 19-24; Docket Item 131.

On October 30, 2020, Judge Roemer signed a criminal complaint and issued an arrest warrant. Docket Items 1, 2, 59 at 20-25. A few days later, Judge Wiley Dancks issued a warrant to search Lettieri's person, vehicle, and residence located at 231 Doolittle Road, Harpursville, New York. Docket Item 59 at 28-29; Docket Item 128 at 19-24. And on February 10, 2021, Judge Roemer issued a third warrant authorizing a search for information associated with a T-Mobile telephone number. Docket Item 78 at 17; 21-MJ-5022 at Docket Items 1, 2.

On the morning of November 5, 2020, Garver, Hockwater, Task Force Officer Eric Schmidt, and other law enforcement officers arrived at Lettieri's residence to execute both the arrest warrant and the search warrant. Docket Item 59 at 26-36; Docket Item 128 at 15-24; Docket Item 131. Lettieri and his friend Siegel had planned to meet at Lettieri's residence at 10:00 a.m. that same day so that Siegel could help Lettieri "organize his things." Docket Item 59. at 126-127. At about 8:15 a.m., Lettieri texted Siegel, "I need you here now." *Id*. at 127. But before Siegel arrived at Lettieri's

[5] On that same date, Judge Roemer also issued a search warrant for a Verizon wireless telephone number. Docket Item 78 at 17; 20-MJ-5264-02 at Docket Items 1, 2. The search warrant for the Verizon telephone number is not the subject of the pending motions to suppress.

residence, Lettieri was searched, handcuffed, arrested, and taken to the FBI Binghamton Office by Garver and Hockwater. *Id*. at 39-41, 128-29. Schmidt and the other law enforcement officers remained at 231 Doolittle to execute the search. *Id*. at 42.

During the drive to Binghamton, Garver read Lettieri *Miranda* warnings and ensured that Lettieri understood each one. Docket Item 59 at 47-52. At a stop, Lettieri's handcuffs were removed and he signed the FBI "Advice of Rights" form's "Consent" section, indicating that he understood his rights and was willing to speak with law enforcement without a lawyer present. Docket Item 59 at 54-56; *see* Docket Item 128 at 27 (signed FBI "Advice of Rights" form).

Once Lettieri signed the form, Garver and Hockwater asked him questions. Docket Item 59 at 57. Lettieri told them that he indeed had been communicating with a minor female and had travelled to Bliss, New York, to meet her. *Id*. at 58. But Lettieri said that he intended to meet with the minor female only to tell her that she was too young to have sex or to communicate with men online. *Id*. at 58-59.

After they arrived in Binghamton, Lettieri was placed in an interview room and the interview continued with a device recording it. Docket Item 59 at 60-61; Docket Item 128 (recorded interview). At the outset of the recorded interview, Lettieri again affirmed that he understood his *Miranda* rights and that he was willing to answer questions. Docket Item 59 at 67-68; Docket Item 128 (recorded interview).

Hockwater prepared a handwritten statement summarizing what Lettieri told them; he told Lettieri that he was going to read it out loud, and he asked Lettieri to correct any errors. Docket Item 128 at 33-34 (handwritten statement). As Hockwater

presented the statement to Lettieri and began to read it out loud, Lettieri said, "I really don't want to sign anything." Docket Item 128 (recorded interview). Hockwater assured Lettieri that he did not have to sign anything but that Hockwater wanted to make sure that everything in the statement was true. *Id.*

Hockwater then read the statement to Lettieri, and Lettieri made a couple corrections. *Id.*; *see also* Docket Item 128 at 33-34. Lettieri agreed that everything in the summary was true, but he declined to sign it until he could speak to a lawyer friend and have him review it. Docket Item 128 (recorded interview). So Hockwater wrote at the bottom of the form, "[a]ll the above facts are true but I don't want to sign it until I can talk to a lawyer friend." Docket Item 128 at 34.

The interview continued for about another eight minutes with Garver and Hockwater asking Lettieri about photos and videos from Lettieri's Facebook account and Lettieri denying any knowledge about the photos and videos and who was depicted in them. Docket Item 128 (recorded interview). Garver and Hockwater also explained to Lettieri the charges against him and the next steps, including his appearance before a judge. *Id*.

After the interview ended, Garver and Hockwater took Lettieri to the Steuben County Jail. Docket Item 59 at 78-79. On the drive, neither Garver nor Hockwater asked Lettieri any questions because their "interview was complete." *Id*. at 80. But Lettieri continued to talk, asking whether the minor female victim might be charged for misleading him. *Id*. at 80-83. Garver responded that charging the minor was unlikely. *Id*. at 83.

At about the time that Garver, Hockwater, and Lettieri left the Binghamton FBI Office, Schmidt called Garver and told him that Siegel had arrived at the residence to help Lettieri clean and declutter. *Id*. at 85-86. Schmidt called Siegel Lettieri's "friend" and "an attorney." *Id*. Until then, there was no mention of an attorney, *id*.; in fact, during the interview Lettieri never invoked his right to counsel or identified Siegel—or anyone else—as his attorney. *Id*. at 87-88, 90.

Garver and Hockwater did not threaten Lettieri or use any physical force against him. *Id*. at 90-91. Both agents' weapons remained holstered during their entire encounter with Lettieri. *Id*. Neither Garver nor Hockwater ever told Lettieri that he had to speak with them; in fact, at the beginning of the recorded interview, Lettieri was reminded that he was under no obligation to talk. *Id*. at 91; Docket Item 128 (recorded interview). And Lettieri never asked for the interview to stop during the recorded interview or at any other time. *Id*.

Siegel testified on Lettieri's behalf. Docket Item 59 at 125-139. He said that he first met Lettieri in approximately 2013. *Id*. at 126. Siegel described himself as "a real estate attorney" and "not a criminal attorney." *Id*. at 125-26, 131. He testified that he traveled from his home in Stony Brook, New York, on November 4, 2020, to help Lettieri clean and organize his house the next day. *Id*. at 126-127.

Siegel planned to meet Lettieri at his house at 10:00 a.m. on November 5, 2020. *Id*. at 127. He recalled receiving a text from Lettieri at 8:15 a.m. saying, "I need you here now," but when he called Lettieri there was no answer. *Id*. at 127. By the time Siegel arrived at Lettieri's residence, Lettieri already had been arrested and Siegel did not see him that day. *Id*. at 128-29.

## DISCUSSION

Lettieri urges this Court to suppress his statements to law enforcement; to suppress the physical evidence seized from his person, vehicle, and home; and to dismiss the indictment. Docket Item 91. He argues that his statements to law enforcement were obtained in violation of *Miranda* and his Fifth Amendment rights, that the search warrants lacked probable cause, and that the indictment is defective because it fails to identify which underlying statute or statutes Lettieri could have been charged with violating. *Id*.

The government responds that Lettieri waived his rights, signed the "Advice of Rights" form acknowledging his *Miranda* warnings, and consented to speak with law enforcement. Docket Item 97 at 6. The government argues that the affidavits submitted in support of the October 26, 2020 and November 2, 2020 search warrants were accurate and not inconsistent in their description of IP addresses. *Id*. at 10-11. And the government maintains that the indictment is sufficient on its face because it tracks the statutory language, but that even if it is not, the government cured any insufficiency by providing a bill of particulars and thus giving Lettieri notice of the state crimes with which he could have been charged. *Id*. at 14-15.

### I. MOTION TO SUPPRESS STATEMENTS

#### A. *Miranda* Warnings

In the affidavit submitted in support of his omnibus motions, Lettieri says that he is "aware of [his] rights commonly referred to as 'Miranda Rights'" but that he was not advised of those rights on November 5, 2020. Docket Item 24-1 at 3. He also

says that as soon as law enforcement arrived that day, he told them that he had "contacted [his] lawyer" who "was on the way." *Id*. In fact, he says that he "repeatedly asked for [his] lawyer and told [law enforcement that he] wished to remain silent." *Id*. Based on all that, Lettieri argues that his statements should be suppressed. Docket Item 91.

But Lettieri's assertions are belied by both the hearing testimony and the documentary evidence admitted at the hearing. *See generally* Docket Items 59 and 128. Immediately after his arrest, Lettieri was placed in a vehicle to be transported to the FBI Binghamton Office by Garver and Hockwater. Docket Item 59 at 39-41. While on the drive from Lettieri's home to the FBI Binghamton Office, Garver read Lettieri *Miranda* warnings from the FBI "Advice of Rights" form, and he made sure that Lettieri understood each one. Docket Item 59 at 51-52; Docket Item 128 at 27. At a stop, Lettieri signed the form under the "Consent" section, indicating that he understood his rights and was willing to speak with law enforcement without a lawyer present. Docket Item 59 at 54-56; Docket Item 128 at 27. And before the recorded interview at the Binghamton FBI Office began, Lettieri again acknowledged that he understood his *Miranda* rights and his willingness to answer questions. Docket Item 59 at 67-68; Docket Item 128 (recorded interview). So unless this Court rejects the credibility determinations made by Judge Roemer—something that this Court has no reason to do—this Court has no choice but to reject the unsupported assertions in Lettieri's affidavit. *See Carrion v. Smith,* 549 F.3d 583, 588 (2d Cir. 2008) ("[A] district judge should normally not reject a proposed finding of a magistrate judge that rests on a credibility finding without having the witness testify before the judge." (quoting *Cullen v.*

*United States,* 194 F.3d 401, 407 (2d Cir. 1999))); *Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir. 1989) ("Had the district court rejected the magistrate's conclusions regarding the credibility of the central witnesses without hearing live testimony from those witnesses, troubling questions of constitutional due process would have been raised."); *see also United States v. Raddatz,* 447 U.S. 667, 675–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (district court is not required to rehear witness testimony when accepting a magistrate judge's credibility findings).

To establish a valid waiver of the right to remain silent, "the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995). The government must prove a waiver by a preponderance of the evidence. *See United States v. Gaines*, 295 F.3d 293, 297 (2d Cir. 2002). Here, Garver's testimony, the executed consent on the advice of rights form, and Lettieri's recorded statement indicating his willingness to speak with Garver and Hockwater more than meet that burden.

As to his claim that his statements were not voluntary, Lettieri offers nothing save that single conclusory statement. Lettieri does not say that his will was overborn by threats or force or coercion of any kind. On the contrary, the uncontested facts show that neither Garver nor Hockwater threatened Lettieri, demanded that Lettieri speak with them, drew their weapons, or otherwise coerced him in any way. Docket Item 59 at 90-91.

For all those reasons, Lettieri's argument that law enforcement questioning violated his right to remain silent lacks merit.

**B. Right to Counsel**

As noted above, Lettieri's unsupported assertion that he "repeatedly asked" law enforcement "for [his] lawyer" and said that he "contacted [his] lawyer" who "was on the way," Docket Item 24-1, are belied by what Judge Roemer found to be the credible hearing testimony. But in his objections, Lettieri says that he also invoked his right to counsel in two other ways: first, in a text message sent at 8:15 a.m. to Siegel, a real estate lawyer, and second, when he refused to sign a handwritten summary of his interview until a lawyer could review it. Docket Item 91 at 1-4. Lettieri also seems to argue that when Siegel arrived at his home and spoke to law enforcement, that was tantamount to an invocation of Lettieri's right to counsel. *Id*.

To invoke the right to counsel, a defendant must make "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). The right to counsel is personal to the defendant and cannot be invoked on the defendant's behalf by someone else—even by counsel. *See United States v. Medunjanin*, 752 F.3d 576, 587 (2d Cir. 2014). "[A] reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel" does not require interrogation to cease. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (emphasis in original). Nevertheless, courts must

"[r]esolve any doubts in favor of the conclusion that the suspect did not intend any waiver of his right to consult counsel." *United States v. Quiroz*, 13 F.3d 505, 511 (2d Cir. 1993).[6]

Lettieri's text message to Siegel, "I need you here now," certainly was not an unambiguous and unequivocal invocation of the right to counsel. *See McNeil*, 501 U.S. at 178; *Davis*, 512 U.S. at 459. Law enforcement did not know about it, and they had no way of knowing about it. Moreover, the message itself does not invoke anything. It strains all reason to suggest that a private text message to a friend who happens to be a real estate lawyer might somehow be sufficient to invoke one's right to counsel.

Lettieri's suggestion that Siegel's arrival about two hours after Lettieri was arrested somehow invoked Lettieri's right to counsel likewise is a nonstarter. The right to counsel is personal, and it could not be invoked for Lettieri by Siegel or anyone other than Lettieri himself. *See Medunjanin*, 752 F.3d at 576.

Therefore, Lettieri's statements to law enforcement through and including the completion of the handwritten summary clearly are admissible.

The only argument that gives this Court the slightest pause involves Lettieri's refusal to sign the handwritten summary of his interview until his friend, a lawyer, could review it. But Judge Roemer concluded that Lettieri's statement was at most a limited

[6] The Second Circuit's holding in *Quiroz* was called into question by *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010), where the Supreme Court ruled that a defendant had implicitly waived his *Miranda* rights by answering detectives' questions despite having refused to sign a waiver form. *Accord United States v. Plugh*, 648 F.3d 118, 126 (2d Cir. 2011) ("To the extent *Quiroz* can be read as articulating such a rule [i.e., a refusal to sign a waiver of rights form constitutes an invocation of rights], that rule does not survive *Berghuis*."). But the dicta from *Quiroz* cited above is still good law.

invocation of his right to counsel, Docket Item 78 at 13, and this Court agrees with that conclusion.

To begin, Lettieri's reliance on *Quiroz, supra,* to support his argument is misplaced. In *Quiroz*, the defendant refused to sign an advice of rights form without counsel. 13 F.3d at 509. That suggested that he did not want to waive—or did not understand—his right to remain silent; at the very least, it meant that he wanted to talk with a lawyer before he waived anything. Here, on the other hand, Lettieri signed the advice of rights form before any questioning began. He balked at signing a written statement, not at providing the information in that statement. So even if the holding in *Quiroz* is still good law, *see* n.6 *supra*, that would not change the result here.

Because the interview in the FBI interview room, including the request that Lettieri sign the statement, was recorded, what Lettieri said and when he said it are not in dispute. Even before Hockwater started reading the written summary, Lettieri said, "I really don't want to sign anything." *Id*. Beginning at 17:39, and for the next four-and-a-half minutes of the recorded interview, Hockwater read the handwritten summary of Lettieri's statements out loud and asked Lettieri to correct any mistakes. Docket Item 128 (recorded interview). Based on the recording and the handwritten statement itself, at least two corrections or clarifications were made. *See id*.; *id.* at 33-34. Lettieri then agreed that the handwritten statement correctly summarized what he said, but he declined to sign it until a lawyer friend reviewed it. Docket Item 128 (recorded interview). So Hockwater added the following sentence to the handwritten statement: "[a]ll the above facts are true but I don't want to sign it until I can talk to a lawyer friend." *See id.; id.* at 34.

The interview then continued for another few minutes. Docket Item 128 (recorded interview). Hockwater asked Lettieri whether he had any questions and again confirmed that Lettieri wanted to speak with them. *Id*. He asked Lettieri about two photos of a vagina on Lettieri's Facebook account and whether Lettieri knew who was in the photos; Lettieri first responded that he did not know who the person was and then suggested that it might be "Polly" or "Nicole," neither of whom are victims in this case. *Id*. Hockwater also asked about a video of a girl masturbating, and Lettieri said that he had no memory of that. *Id*. Finally, Hockwater explained the charges against Lettieri and the steps that would follow. *Id.*

This Court agrees with Judge Roemer that Lettieri's refusal to sign the written statement was at most a limited invocation of the right to have a lawyer review any *written statement* before he signed it. Indeed, after Lettieri declined to sign the form, Hockwater reconfirmed that Lettieri wanted to speak with law enforcement, and Lettieri continued talking. *Id*. So Lettieri made it clear that he wanted a lawyer to review any statement that he was asked to sign but that he was willing to speak with law enforcement without a lawyer present. And that limited invocation of the right to counsel did not preclude further questioning. *See United States v. Martin*, 664 F.3d 684, 687-90 (7th Cir. 2011) (invocation of right to counsel by defendant who said "I'd rather talk to an attorney before" providing a written statement was limited to written statements and did not preclude further questioning by law enforcement); *see also Ross v. Racette*, 2018 WL 1718057, at *8 (W.D.N.Y. Apr. 8, 2018) (holding that habeas petitioner's invocation of right to counsel before signing written statement did not vitiate his earlier knowing, intelligent, and voluntary decision to speak with police).

In sum, Lettieri never invoked his right to counsel with respect to the statements he made to law enforcement. His motion to suppress based on the alleged violation of his right to counsel therefore is denied.

## II. MOTION TO SUPPRESS EVIDENCE

Lettieri's motion to suppress evidence relates to two of the three search warrants issued during this investigation, and his objections are limited to an alleged inconsistency between the description of IP addresses in the applications for each of those two warrants. *See* Docket Item 91 at 4-5. More specifically, Lettieri says that the statement in Garver's first warrant application that every IP address is unique to each user is incorrect and inconsistent with Garver's later statement that "data obtained from an internet service provider showed that a unique IP address was shared by multiple users, including the defendant." Docket Item 91 at 4. And Lettieri says that "the inconsistency tends to undercut the probable cause finding made by the magistrate judge." *Id*.

Judge Roemer reviewed "the search warrants and warrant applications and [found] that probable cause existed for issuance of each warrant." Docket Item 78 at 20. Likewise, Judge Roemer found that Lettieri "has not shown that any misstatements or omissions contained in the warrant affidavits were material to the probable cause determination." *Id*. at 21. Judge Roemer therefore concluded that there was no reason to suppress any evidence found during any of the three searches. *Id*. at 22.

With respect to the specific inconsistency about which Lettieri now objects, Judge Roemer found that the warrant applications were not inconsistent: "The only variation

between the affidavits was that the October 26, 2020 affidavit explained general information about IP addresses and the November 2, 2020 affidavit stated that data obtained from an Internet Service Provider showed that a unique IP address was shared by multiple users, including the defendant." *Id*. at 21. In other words, Judge Roemer found that one warrant application described IP addresses and that the other added the fact that one address had been shared by multiple users. Those statements, Judge Roemer concluded, were "not material inconsistencies and [did] not mislead the reviewing magistrate." *Id*.

Judge Roemer found that Lettieri's additional "claims of misrepresentation [were] baseless" as well. *Id*. For example, with respect to Lettieri's claim that the warrant application sought information from *Facebook* when the alleged communication between Lettieri and the victim occurred on *Facebook Messenger*, Judge Roemer noted that "Facebook owns the Messenger application[,] and the relevant messages were obtained from Facebook pursuant to the search warrant." *Id*.

Based on all that, Judge Roemer concluded that Lettieri was not entitled to a *Franks* hearing and that the evidence seized should not be suppressed. And largely for the reasons stated by Judge Roemer, this Court agrees.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In deciding whether to issue a search warrant,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And

> the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (internal citations omitted). In fact, because warrants are preferred,

> circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner.... [T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.

*Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991) (*quoting United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 131 L.Ed.2d 684 (1965)). And "[a] reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993); *see also United States v. Nichols,* 912 F.2d 598, 602 (2d Cir.1990) (search warrant); *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983) (search warrant).

Especially given that deference and the presumption of a warrant's validity, *see Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), this Court agrees with Judge Roemer that Lettieri has not met his heavy burden of showing any of the three warrants to have been issued based on less than probable cause.

Lettieri also requested a *Franks* hearing. *See* Docket Item 24 at ¶ 31. To be entitled to such a hearing, a defendant must show that: 1) the warrant affidavit contains a false statement; 2) the false statement was included intentionally or recklessly; and 3) the false statement was integral to the probable cause finding. *Franks*, 438 U.S. at 155-56.

Whether Lettieri has met the threshold to justify a *Franks* hearing is not a close call. As Judge Roemer found, Lettieri never made "a substantial preliminary showing of an intentional or reckless misstatement or omission, let alone one that was necessary to the judge's finding of probable cause." Docket item 78 at 21-22. And as Judge Roemer explained, what Lettieri says are inconsistencies do not amount to material misstatements or omissions sufficient to justify a *Franks* hearing. *See* Docket Item 78 at 20-22.

Judge Roemer also found that "the 'good faith exception' established in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)," precludes suppression, Docket Item 78 at 22, and this Court agrees with that finding as well. Under *Leon*, as long as law enforcement acted with objective and reasonable good faith in applying for and executing a warrant, any evidence seized should not be suppressed even if the judicial officer erred in finding probable cause to issue the warrant. *See Leon*, 468 U.S. at 922-23. Here, there is no reason to believe that law enforcement acted with anything other than good faith, and so even if the warrant applications were deficient, Lettieri's argument still would fail.[7]

[7] Apparently to address the good faith issue, Lettieri poses a "query" in his objections: "Does the fact that Garver did not participate in the search directly, despite having knowledge of the inconsistencies between the October and November search warrant applications he authored, have any relevance to the application of the *Leon* good faith exception in this particular case?" *See* Docket Item 91 at 5. But that question, which Lettieri does not even attempt to answer or otherwise address in any way, gives this Court no reason to revisit Judge Roemer's conclusion about the good faith exception.

For all the above reasons, Lettieri's objections to Judge Roemer's recommendation to deny his motion to suppress evidence are overruled, and Lettieri's motion to suppress evidence found during the searches is denied.

## III. MOTION TO DISMISS

Lettieri argues that because the indictment charges him with enticing a minor to commit an act for which someone could be convicted of a crime, it also must specify the underlying crime to which the charge refers. Docket Item 91 at 4-7. He may be correct. Then again, he may not.

As Judge Roemer noted, "[t]he Second Circuit has repeatedly confirmed that an indictment need do little more than track the statutory language of the statutes charged and state the time and place (in approximate terms) of the alleged crime." Docket Item 78 at 23 (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal citations omitted)). But the Seventh Circuit has held that in cases like this one, the underlying crime that the minor was enticed to participate in is an essential element of the crime. *See United States v. Mannava*, 565 F.3d 412 (7th Cir. 2009).[8] And the law is far from clear: In fact, as the government's response points out, there appears to

[8] In his commentary to the Modern Federal Jury Instructions, Judge Sand says that the better practice is to identify the underlying sexual offense in the indictment but that the First Circuit has held that the failure to do so was at worst harmless error. *See* L. Sand, *et al.*, *Modern Federal Jury Instructions-Criminal* (2021), ¶ 64.03, No. 64-13.1; *see also* *United States v. Berk*, 652 F.3d 132, 138–39 (1st Cir. 2011); *United States v. Rodriguez-Rodriguez*, 663 F.3d 53, 57–59 (1st Cir. 2011) (sexual offense noted in indictment included other offenses besides the one for which was defendant was tried, but there was no constructive amendment of indictment since intent to commit charged offense was proven).

be a circuit split. *Compare Mannava, supra, with United States v. Jockisch*, 857 F.3d 1122 (11th Cir. 2017).

But all that is of no moment, because even if the indictment is defective in failing to identify the underlying crime, any error was cured by the bill of particulars, Docket Item 41 at 9, which identified the underlying offenses without any doubt. *See United States v. Vickers*, 708 F. App'x 732, 735 (2d Cir. 2017). In *Vickers*, the Second Circuit declined to decide whether the indictment erred in not explicitly reciting the underlying crimes with which the defendant could have been charged because any error was harmless in light of the bill of particulars specifying those laws. *Id*. The parallel situation here leads to the same conclusion.

By supplying a bill of particulars, the government has laid its cards on the table and is bound by what it claims its proof will be at trial. *See United States v. GAF Corp.*, 928 F.2d 1253, 1258-62 (2d Cir. 1991) (finding trial judge should have permitted the bill of particulars to be admitted against the government when government changed theory of its case). As the Second Circuit has explained, "[a]ny suggestion that the bill is not an admission because it does not represent statements based upon the government's own knowledge is . . . unavailing." *GAF*, 928 F.2d at 1261 (*citing United States v. McKeon,* 738 F.2d 26, 32 (2d Cir. 1984)). So the indictment, together with the bill of particulars, certainly gave Lettieri enough notice of the "core of criminality" with which he was charged and bound the government to its theory of proof. *See United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012).

As Lettieri himself suggests in his objections, his motion to dismiss may at its core be a "concern [ ] that the government, at trial, may constructively amend the

indictment by expanding the universe of criminal offenses the defendant can be charged with based upon the proof." Docket Item 91 at 7. In fact, given the government's proposed jury instructions and the proposed verdict sheets from both sides, the government and Lettieri appear to agree that the elements of the state statutes with which Lettieri could have been charged are elements of the federal crime with which he has been charged—18 U.S.C. § 2422(b)—and therefore must be the subject of unanimous special verdict findings. *See* Docket Item 91 at 6; Docket Items 101, 107 at 10-13, and 121; *see also Mannava*, 565 F.3d at 415. But regardless, Lettieri's objection to Judge Roemer's recommendation that this Court deny his motion to dismiss is misplaced, that objection is overruled, and the motion to dismiss the indictment is denied.

## CONCLUSION

For the reasons stated above and in Judge Roemer's RR&O, Lettieri's motions to suppress his statements and evidence seized during three searches, and his motion to dismiss the indictment, Docket Items 24, are DENIED.

SO ORDERED.

Dated: May 30, 2023
Buffalo, New York

***s/ Lawrence J. Vilardo***
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE